***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence and upon reconsideration the Full Commission modifies and affirms the Opinion and Award of the Deputy Commissioner.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the alleged injuries giving rise to these claims, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act as set forth below.
2. At such time, an employment relationship existed between plaintiff and defendant-employer.
3. Sedgwick CMS was the carrier on the risk for defendant-employer on April 15, 2005, September 19, 2006, and November 10, 2006. Sedgwick CMS admitted liability for the April 15, 2005 accident by filing a Form 60 Employer's Admission of Employee's Right toCompensation.
4. Key Risk Insurance Company was the carrier on the risk for defendant-employer on September 16, 2007, March 5, 2008, and October 31, 2008. Key Risk filed a Form 61 Denial of Workers' Compensation Claim for each claim.
5. Plaintiff filed Form 33 hearing requests in all six claims, and they were consolidated for hearing before the Deputy Commissioner by Order filed on March 20, 2009.
6. The following stipulated exhibits are admitted into evidence:
 (1) Pre-trial Agreement
 (2) Industrial Commission forms and filings
 (3) Plaintiff's medical records (two bound volumes)
 (4) Wage and personnel records, including documentation of all medical and indemnity compensation paid for by Sedgwick CMS *Page 3 
7. Plaintiff received temporary total and/or temporary partial disability benefits from Sedgwick CMS in the amounts shown in Stipulated Exhibit #4.
8. The parties stipulated that at the time of the first four accidents, plaintiff's average weekly wage was $637.36. The parties further stipulated that plaintiff's average weekly wage as of March 5, 2008 was $849.49, and the average weekly wage as of October 31, 2008 was $785.68.
9. The issue before the Full Commission is which carrier is responsible for payment of ongoing medical and indemnity benefits.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. As of the date of the hearing before the Deputy Commissioner, plaintiff was 33 years old. Plaintiff graduated from high school, attended a couple of years of college, and obtained paramedic certification. She is employed by defendant-employer Halifax County as a paramedic, having been hired in 2001. Before working for defendant-employer, plaintiff worked for a private ambulance company in Charlotte. Plaintiff's primary duty as a paramedic was to provide patient care, but her duties also included housekeeping, doing laundry, supplying the buildings, driving trucks, and keeping the fire station clean.
2. First Accident, I.C. No. 531625: On April 15, 2005, plaintiff sustained an injury by accident when plaintiff and a co-worker were carrying a patient on a stretcher and the patient began to have a seizure. As plaintiff tried to prevent the stretcher from tipping over and tried to keep the patient from falling off the stretcher, she sustained an injury to her back. Sedgwick *Page 4 
CMS, the carrier on the risk, accepted the resulting injury as compensable and began paying plaintiff benefits, including temporary total disability in an amount equal to $425.12 per week.
3. On April 16, 2005, plaintiff was seen at Halifax Regional Medical Center (HRMC) where she complained of back pain after she had lifted a patient the prior day. She was diagnosed with an acute myofascial strain. She was given prescription medication and instructed to apply ice to the affected area for 30 minutes several times a day and to take warm showers twice a day. Plaintiff was released to return to work with restrictions including no lifting over three pounds, no bending from the lower back, and alternate sitting/standing/walking as tolerated.
4. Plaintiff was also seen at Halifax Works, a division of HRMC, on April 18, 2005, complaining of lower back pain radiating across both sides. She was instructed to attend physical therapy and given prescriptions for Percocet and Flexeril. She was excused from work until follow-up with pain management. Plaintiff continued to be treated for her back pain with conservative care through Halifax Works. She was given prescription medication, and her out-of-work restriction was continued into May.
5. Throughout May 2005, plaintiff continued her conservative treatment through Halifax Works. She participated in physical therapy. She was released to return to work effective May 11, 2005 with restrictions including no lifting greater than 5-10 pounds, no bending from the lower back, and alternate sitting/standing/walking as tolerated. A lumbar MRI was also ordered.
6. Plaintiff underwent an MRI of her lumbar spine on June 2, 2005, which was read as normal in all segments. Plaintiff continued to be treated conservatively through Halifax Works. She was released to return to regular duties on June 15, 2005. As of her June 21, 2005 *Page 5 
visit, plaintiff was given a home TENS unit and instructed to continue physical therapy. She was released to return to regular duties as tolerated.
7. Plaintiff was evaluated by Dr. Joey Thomas at Roanoke Valley Pain Center on July 20, 2005. Dr. Thomas reviewed her lumbar spine MRI and found it was normal. His impression was lumbar facet joint syndrome and lower back pain. He scheduled a diagnostic lumbar facet block on the right side. If the facet block did not help, Dr. Thomas thought plaintiff would benefit from a provocative discogram to see if there was any occult discogenic disease contributing to her lower back pain. He also started plaintiff on Celebrex.
8. Plaintiff underwent the facet block on August 11, 2005, and she was released to return to work on August 13, 2005. When plaintiff returned to see Dr. Thomas on August 22, 2005, she reported incomplete relief for only a few hours. Dr. Thomas ordered a transforaminal lumbar epidural steroid injection (ESI) at L5-S1 on the right side. He excused her from work until August 26, 2005. He also prescribed Celebrex, Skelaxin, and Tramadol. Following her injections, plaintiff was instructed to refrain from heavy lifting.
9. Plaintiff saw Dr. Thomas on September 13, 2005 and reported that the ESI had provided complete relief of her back pain radiating down her right leg for two weeks. While transferring a patient at work one day, she experienced a recurrence of pain. Dr. Thomas' impression was lower back pain, possibly discogenic in origin or from the L5 root level. He administered a second ESI at L5-S1 on the right. Dr. Thomas restricted plaintiff from work until results of a discogram could be obtained.
10. Plaintiff underwent a lumbar spine CT scan and discogram on October 12, 2005. The CT scan revealed limited abnormality with early annular thinning. The discogram revealed L3-4, *Page 6 
L4-5, and L5-S1 induced pain somewhat similar to plaintiff's pattern of chronic pain. The L5-S1 disc showed some thinning of the posterior annulus.
11. Plaintiff continued to complain of her lower back pain and during her October 25, 2005 visit with Dr. Thomas, he noted she was "miserable, in tears, complaining of severe pain." Dr. Thomas' impression was lower back pain with positive discogram at L5-S1, but also some painful discogram at L3-L4 and L4-L5 levels. He recommended referral to a spinal surgeon, and he prescribed Celebrex, Skelaxin, Ambien, Elavil, and a Duragesic patch. He restricted plaintiff from work completely until evaluation by a spine surgeon, and did not plan any further visits to his pain clinic.
12. On December 5, 2005, plaintiff was examined by Dr. Dennis Bullard at Triangle Neurosurgery. Dr. Bullard reviewed the MRI, which he found normal, and reviewed the discography of October 12, 2005, noting that all three discs induced pain. Dr. Bullard found no structural surgical lesion for plaintiff's pain. Since surgery was not deemed appropriate, he recommended consultation with either Carolina Pain Consultants or Carolina Back Institute.
13. Following Dr. Bullard's examination, plaintiff returned to Dr. Thomas' office on December 9, 2005, reporting dissatisfaction with the spinal surgery consultation. Dr. Thomas recommended vocational rehabilitation to return plaintiff to any other type of job that she could do without much discomfort. He also recommended another evaluation with Dr. Kurt Voos at the Center for Scoliosis and Spinal Surgery. In the interim, Dr. Thomas increased the Duragesic to control her pain and Elavil at night. He also recommended a water aerobics program for conditioning exercise. Dr. Thomas recommended that plaintiff remain out of work for at least one more month. *Page 7 
14. At her visit of January 9, 2006, Dr. Thomas performed an inter-articular injection of the right sacroiliac joint region under fluoroscopic guidance. The SI joint injection provided plaintiff complete relief of pain in her lower back and right buttocks region. Dr. Bullard allowed plaintiff to return to work as of January 12, 2006, with significant restrictions to include no lifting greater than 10 pounds, no pushing or pulling more than 25 pounds, no overhead work, and alternate sitting/standing/walking every one hour. Plaintiff was to participate in physical therapy, to be followed by a functional capacity evaluation (FCE) to see if she could continue performing her job as a paramedic.
15. Plaintiff returned to see Dr. Thomas on January 30, 2006 and reported excellent pain relief. She asked to be released to work. Dr. Thomas assessed sacroiliac joint dysfunction, lower back pain, currently resolved. He found plaintiff to be at maximum medical improvement and assigned work restrictions of no lifting greater than 25 pounds.
16. Plaintiff underwent a functional capacity evaluation (FCE) on February 1, 2006, which revealed that she could return to an eight-hour day and perform heavy physical demand level lifting up to 100 pounds. Physical therapist Alex Arab noted that plaintiff should be able to return to her regular job based on the FCE results. Following the FCE, Dr. Thomas released plaintiff to return to work on February 6, 2006 with no restrictions. Dr. Thomas completed a Form 25R on March 7, 2006 indicating that plaintiff had been released to work at full duty. He did not assign any permanent partial impairment rating at that time.
17. Plaintiff experienced increased symptoms and returned to see Dr. Thomas on April 27, 2006. During this visit, she complained of significant pain involving her right buttock, explaining that it had been getting numb for the past three weeks and was painful the last three days. Plaintiff did not recall lifting patients or pushing or pulling heavy objects. Dr. Thomas' *Page 8 
impression was sacroiliac joint dysfunction with reactivation of pain. He restricted her from work until she felt better. He prescribed Skelaxin, Celebrex, and Ultram. Dr. Thomas administered an injection the following day.
18. Plaintiff continued her conservative treatment with Dr. Thomas through May, June and July, 2006. Plaintiff reported that the initial injection had given her excellent relief for about one and one-half weeks, and Dr. Thomas did a repeat injection on the right side on May 22, 2006. During part of this time, Dr. Thomas kept plaintiff out of work and she received disability compensation.
19. At plaintiff's visit on June 21, 2006, she reported to Dr. Thomas that her pain had decreased significantly since she had been out of work. She wanted to return to work and at her request, Dr. Thomas released her to return to full duty. Dr. Thomas indicated that the first week should consist of desk work and then plaintiff could advance to full time unrestricted duty on June 29, 2006. He also advised plaintiff to maintain good posture at all times on and off work.
20. When plaintiff saw Dr. Thomas on July 17, 2006, she was making slow progress, but experienced unexpected and excruciating pain in the right buttocks when she had just bent over to tie her shoes. She was crying during this visit. Dr. Thomas administered a sacroiliac joint injection and prescribed Celebrex and Ultram. He restricted plaintiff from work until July 21, 2006 and instructed her to wear the sacroiliac joint brace. When she resumed work on July 22, 2006, Dr. Thomas advised plaintiff to lift nothing greater than 25 pounds.
21. Plaintiff returned to see Dr. Thomas next on July 31, 2006. The injection had provided excellent relief. Dr. Thomas released plaintiff to return to light duty work to include a desk job for two weeks, after which time she could advance to full duty. He also advised her to wear the sacroiliac joint brace. *Page 9 
22. Second accident, I.C. No. 783037: On September 19, 2006, plaintiff was lifting a heavy patient when she again hurt her back. While plaintiff's low back and right leg symptoms had never gone away since the April 15, 2005 injury by accident, she had been able to return to work. The incident of September 19, 2006 caused a worsening of her symptoms. Sedgwick CMS continued to be the carrier on the risk at this time.
23. Plaintiff was seen at Halifax Regional Medical Center on September 20, 2006, and assessed with acute myofascial strain and acute low back pain. She was instructed to continue her medications and prescribed Percocet. She was also instructed to follow-up with Dr. Thomas or her primary care physician. Plaintiff was restricted from work for two days. On September 22, 2006, she was seen at Halifax Works and reported that her pain was gone, and she was ready to go back to work. Plaintiff was released to return to work without restrictions. Dr. Thomas signed a Form 25R on October 13, 2006 assigning an 8% permanent impairment rating to plaintiff's back.
24. Third accident, I.C. No. 783038: On November 10, 2006, as plaintiff was doing laundry as part of her job duties, she bent over to retrieve laundry out of a dryer and felt a pop and pain in her back. She was again seen at Halifax Regional Medical Center and assessed with acute low back pain, similar to her prior episodes. A lumbar spine x-ray of November 13, 2006 was negative. Plaintiff received conservative care for her low back injury at Halifax Works and from Dr. Thomas and Roanoke Valley Pain Center.
25. Dr. Thomas performed repeat intraarticular joint injections on November 20, 2006. At her visit of December 4, 2006, Dr. Thomas recommended a repeat MRI of her spine. He had a lengthy discussion with plaintiff, advising that he had done all he could do for her. Dr. Thomas recommended referral to a major pain center like a tertiary care center at the University *Page 10 
Hospital in Greenville or Chapel Hill. He restricted plaintiff from work until further notice. The repeat MRI of the lumbar spine was done on December 15, 2006, and again showed no abnormalities,i.e., no lumbar herniation or stenosis.
26. Plaintiff was evaluated by Dr. Robert Lacin at Raleigh Center for Neurosurgery Neurosciences on February 6, 2007. Dr. Lacin reviewed plaintiff's MRI and discogram. He also determined that plaintiff was not a surgical candidate and referred her to an intensive reconditioning program such as the one used at Carolina Back Institute. He noted that this intensive treatment required daily attendance, and plaintiff would need to be out of work until she completed the treatment. If plaintiff did not respond to therapy, Dr. Lacin thought she would be at maximum medical improvement.
27. Plaintiff presented to Carolina Back Institute for examination by Dr. Christopher Godbout on March 26, 2007. Plaintiff reported the three incidents to Dr. Godbout. Dr. Godbout noted that the July 2006 and November 2006 incidents had no significant mechanisms to cause an injury and would be consistent with recurrent axial low back pain. Dr. Godbout also reviewed Dr. Lacin's note and the FCE results. At that time, plaintiff had not actively worked as a paramedic since November 2006, although still employed by defendant-employer.
28. Dr. Godbout's impression was right-sided axial low back pain most consistent with right sacroiliac joint dysfunction versus lumbar facet syndrome. He noted that plaintiff did not have clinical evidence of discogenic mediated pain. Dr. Godbout concurred that plaintiff was not a surgical candidate and recommended that she participate in an intensive reconditioning program, with a psychological and physical therapy evaluation.
29. Plaintiff participated in the Prevail Program through Carolina Back Institute, completing it around May 3, 2007. Plaintiff reported to her physicians that she felt good enough *Page 11 
to be "very confident that she can do her job as a paramedic without any restrictions full-time, including the shift work that she had been accustomed to." This was set out in a May 10, 2007 letter from Dr. Catherine Duncan at the Carolina Back Institute. Plaintiff appeared to be highly motivated to return to work and if she would continue the efforts demonstrated during the four weeks of the program, the treating medical providers believed plaintiff was likely to continue to experience further gains in her self-regulation pain management ability. As of May 10, 2007, plaintiff was released to return to full duty work. Dr. Duncan also assigned a 7% permanent impairment rating to plaintiff's back.
30. Plaintiff did return to work at that time and continued to work full-duty. Although she had back pain for which she received treatment, she was able to work. Plaintiff has consistently demonstrated that she is motivated to work. At the hearing, the Deputy Commissioner noted that she found plaintiff's presentation to be sincere and, as noted by the treating physicians, that plaintiff is motivated to work. Plaintiff enjoys her job and has consistently requested that the treating physicians release her to return to her work as a paramedic.
31. Fourth accident, I.C. No. 795384: On September 16, 2007, plaintiff experienced another incident which aggravated her back pain. She was in the bay area gathering supplies to restock the ambulance. As plaintiff was lifting a bag of saline solution from a box on the bottom shelf, she felt a sudden increase of low back pain and right leg pain. Also later on September 16, 2007, plaintiff helped to lift a 400 pound patient, which also aggravated her back condition. Plaintiff testified about this lifting incident, although it was not mentioned on her Form 18.
32. Plaintiff filed a Form 18, reporting the incident when she was lifting the bag of saline solution. At this time, defendant Key Risk was the carrier on the risk. *Page 12 
33. Plaintiff was treated at Halifax Regional Medical Center on September 16, 2007. She was instructed to continue her home medications and prescribed Robaxin and Norco. She was also instructed to apply ice packs to the affected area for 20 minutes every few hours. She was released to return to work on September 21, 2007 with no restrictions.
34. Plaintiff returned to Carolina Back Institute on September 20, 2007. She reported that five days before she had bent over to pick up a box of normal saline when she had the onset of low back and right leg pain, and that later that day, she had helped to move a 400-pound patient, which also exacerbated her symptoms. A lumbar spine MRI was recommended, and plaintiff was kept out of work pending follow-up. Her Norco was refilled and she was instructed to continue with the techniques she learned in the Prevail Program.
35. On October 19, 2007, plaintiff underwent a lumbar spine MRI, which revealed changes from the prior study, including a new finding of "very minimal disc bulging at the L5-S1 level" and otherwise no evidence of focal herniation or significant stenosis.
36. Plaintiff then followed up at Carolina Back Institute on October 31, 2007. Plaintiff complained of ongoing low back and right leg pain and described numbness and paresthesias in her right leg. She was assessed with right sacroiliac joint dysfunction, L5/S1 degenerative disc disease with symptoms consistent with right lumbar radiculitis without overt radiculopathy, and discogenic pain with internal disc disruption.
37. Plaintiff eventually returned to work in November 2007, but continued to treat with Carolina Back Institute, receiving epidural steroid injections at L5-S1. By January 2008, plaintiff was still reporting pain levels of eight and one-half out of 10 (8.5 / 10), a difference from her prior pain complaints. *Page 13 
38. On January 28, 2008, plaintiff was seen at Roanoke-Chowan Hospital, with her ongoing complaints of low back pain, radiating down the right leg. She was assessed with low back pain with radicular component, right greater than left, and possible lumbar facet arthropathy. A lumbar epidural steroid injection was administered at L5-S1.
39. On February 4, 2008, plaintiff presented to Rural Health Group with a chief complaint of chronic back pain from the April 2005 accident. Dr. Jane McCaleb discussed a narcotic contract, and plaintiff underwent a urine drug screen. On February 19, 2008, plaintiff signed the narcotic contract, and Dr. McCaleb prescribed Lortab.
40. Fifth accident, I.C. No. 889462: On March 5, 2008, plaintiff was moving a heavy patient from a stretcher to a hospital bed when she experienced an immediate onset of low back and right leg pain. This incident occasioned an emergency room visit and eventually led to an appointment with Dr. Kurt Voos, who became her primary treating physician. Key Risk was the carrier on the risk at the time of this accident.
41. On March 6, 2008, plaintiff presented to Halifax Regional Medical Center, complaining of chronic back pain and pain down her right leg. She underwent lumbar spine x-rays, which revealed evidence of mild lumbar scoliosis convex to the left. She was assessed with acute myofascial lumbar strain, chronic low back pain, and acute right sciatica. Plaintiff was instructed to continue home medications and discontinue Baclofen, and was prescribed Valium, and released to return to work with no lifting greater than five pounds and no bending from the lower back.
42. Plaintiff returned to see Dr. McCaleb on March 13, 2008 for back and right leg pain. Dr. McCaleb assessed a lumbar strain with radicular pain, prescribed Oxycodone, and *Page 14 
restricted plaintiff from driving and working. Plaintiff was written out of work from March 13-March 19, 2008.
43. Plaintiff was seen by Dr. Kurt Voos at the Center for Scoliosis Spinal Surgery on March 17, 2008. At this initial visit, plaintiff reported her prior work accident of 2005 and that her pain got better. She also reported the accident of March 5, 2008, when, as she was moving a patient from a stretcher to a bed, she began having low back pain, and her leg went numb. Plaintiff had been working light duty from the accident date until she went out of work March 13, 2008.
44. Dr. Voos reviewed the most recent lumbar MRI, noting it showed mild disk bulging at L5-S1. He was also aware of the prior discogram, revealing questionable concordant pain at L5-S1. Dr. Voos recommended supplementing her MRI with a CT myelogram to evaluate for significant impingement, and he held plaintiff out of work.
45. The myelogram, performed on April 10, 2008, revealed mild, multilevel LS facet arthrosis and a mild disc bulge at L4-5 and L5-S1. There was no evidence of significant canal or foraminal narrowing at any level, and no evidence of disc protrusion, disc extrusion, osteophyte or other prominent, focally impinging lesion. Dr. Voos reviewed the myelogram on April 30, 2008. He did not see anything operative. Dr. Voos released plaintiff to return to full duty work on May 5, 2008.
46. Plaintiff returned to see Dr. Jane McCaleb at Rural Health Group on August 27, 2008, complaining of chronic back and leg pain. She was assessed with lumbosacral neuritis and prescribed Lortab. Plaintiff was pregnant at that time. Dr. McCaleb took plaintiff out of work until September 10, 2008. *Page 15 
47. When plaintiff returned to Dr. McCaleb on September 10, 2008, she reported that she was still taking Lortab and wanted to return to work. It appears that Dr. McCaleb had planned to keep plaintiff out of work for two more weeks, per a note, otherwise marked "void." At plaintiff's request, however, Dr. McCaleb told her to stop taking Lortab and released her to return to work with a lifting restriction that she lift patients under 200 pounds, noting plaintiff was "at risk for injury."
48. Plaintiff returned to see Dr. McCaleb on September 24, 2008 for follow-up of back pain. At the time, she was 25 weeks pregnant. Plaintiff reported sufficient enough improvement to return to regular duty. An FMLA Certification form was completed which indicated that plaintiff's condition began in April 2005 and continued through that date. According to the form, plaintiff was released to return to work.
49. Sixth accident, I.C. No. 194799: On October 31, 2008, plaintiff and her partner were carrying a quadriplegic patient out of his house on a stretcher to an ambulance. As they walked down a ramp while carrying the patient, plaintiff tripped, not knowing a step was missing. Plaintiff twisted her back, but did not fall to the ground because she held onto the stretcher. Her lower back and right leg began to hurt, and her left side also started hurting.
50. On November 3, 2008, plaintiff presented to Halifax Works for back pain. By this time, plaintiff was seven and one-half months pregnant. She was instructed to take Tylenol, apply warm compresses, and was released to return to work with no lifting greater than 10-15 pounds and alternate sitting/standing/walking as tolerated. 51. Plaintiff returned to Dr. Voos' office on November 10, 2008 for complaints of increased back pain that went down into her legs following the October 2008 accident. Plaintiff was seven and one-half months pregnant at the time, and she reported that she was due to give *Page 16 
birth on January 6, 2009. Dr. Voos took plaintiff out of work. His diagnosis on a medical absence report was "lumbar disk bulge with low back pain and lumbar radiculopathy." Dr. Voos testified that he was sure the fact plaintiff was seven and one-half months pregnant "had some influence" on her being excused from work.
52. Plaintiff gave birth to her son on December 17, 2008. She does not seek indemnity compensation for the six-week period she was out of work on maternity leave following the birth of her child.
53. When plaintiff again visited Dr. Voos' office on February 9, 2009, she reported that she had delivered her baby six to seven weeks earlier. She continued to have a lot of pain in her back with aching into the right hip and right leg. She had no symptoms in the left leg. Dr. Voos ordered a discogram to supplement the CT myelogram he obtained in April 2008, and plaintiff was excused from work until after the discogram was obtained and reviewed.
54. The discogram, performed on March 12, 2009, revealed concordant pain at L5-S1. At plaintiff's March 25, 2009 visit, Dr. Voos noted that plaintiff had failed an extensive non-operative course of treatment. He recommended that she proceed with surgery in the form of an anterior lumbar interbody fusion at L5-S1, the final course of treatment for patients with ongoing back pain. Plaintiff agreed to proceed with surgery.
55. Dr. Voos performed the surgery on April 24, 2009. At the time his deposition was taken, he had not released plaintiff to return to work.
56. Sedgwick CMS was the workers' compensation carrier on the risk for defendant-employer at the time of the first three accidents in April 2005, September 2006, and November 2006. A Form 60 admitting liability was filed by Sedgwick after the first accident, and Sedgwick paid medical compensation and indemnity benefits for all of the time plaintiff was out *Page 17 
of work. After the September and November 2006 accidents, Sedgwick did not file any form either accepting or denying compensability, but it nevertheless paid indemnity benefits at the same compensation rate as the April 2005 accident for all time plaintiff missed from work following the accidents and paid for all medical treatment necessitated by the accidents.
57. By September 16, 2007, Key Risk was the workers' compensation carrier on the risk for defendant-employer. On that date, the fourth accident occurred, and plaintiff filed a Form 18. Despite the fact that Key Risk was the carrier on the risk and plaintiff's Form 18 identifies Key Risk as the carrier, Sedgwick paid for all medical treatment plaintiff received following and resulting from the accident. Sedgwick also paid plaintiff indemnity compensation for all time plaintiff was out of work following the accident.
58. Since her original accident in 2005, plaintiff has continued to experience low back pain. The pain later began radiating down her right leg. Plaintiff has undergone extensive conservative treatment, prior to the surgery performed by Dr. Voos.
59. Dr. Voos, orthopedic surgeon, is the only medical provider to testify in this case. Therefore, the Full Commission gives great weight to the opinions of Dr. Voos regarding a determination of causation in the case and which carrier should be responsible for subsequent medical treatment and indemnity payments. Dr. Voos stated that from the original accident of 2005, to the time plaintiff had the CT myelogram and diskogram with his office, there was nothing new radiographically, but there was an aggravation of the underlying condition. The most recent accidents of March 5, 2008 and October 31, 2008, in Dr. Voos' opinion, aggravated plaintiff's underlying condition.
60. As recognized by Dr. Voos, there is no real way to apportion injury between the numerous accidents, six in all, which plaintiff has sustained. Dr. Voos testified that the *Page 18 
subsequent accidents aggravated her prior condition. Dr. Voos was unable to state with any degree of certainty the impact of any of the six incidents on plaintiff's eventual need for surgery and out-of-work time, other than the opinion that the last two incidents aggravated plaintiff's condition. At his deposition Dr. Voos was asked if one or the other of the six reported incidents caused the need for plaintiff's surgery and current disability. He responded that he was unable to pinpoint which incident was responsible or whether surgery would have been needed for the original four injuries alone. Dr. Voos further explained that "You would like for me to sit here and assign some percentages; this one did this, this one did that. That would make everyone happy, but I don't know that you can actually sit here and arbitrarily assign some percentages."
61. Because Dr. Voos was unable to apportion a certain percentage of plaintiff's condition between the multiple accidents, the Commission finds that plaintiff's back condition after March 5, 2008 and the subsequent surgery on April 24, 2009 were due to a combination of the six accidents that she sustained in her employment with defendant-employer.
62. Plaintiff's total disability after March 5, 2008, is a proximate result of the work-related back injury by accident she sustained on April 15, 2005, as aggravated by the subsequent accidents. Due to her back injury, plaintiff was unable to earn wages in her employment or any other employment for the following periods of time: March 17, 2008 to May 4, 2008; from August 27, 2008 to September 23, 2008, and from November 10, 2008, to the present and continuing. Plaintiff is not entitled to compensation from November 10, 2008 through February 11, 2009, the period prior to and immediately after the birth of her son. Her claim for indemnity after November 10, 2008 would therefore begin February 11, 2009.
63. The greater weight of the evidence is that plaintiff's medical treatment after March 5, 2008, including, but not limited to, the surgery on April 28, 2009, has been reasonably *Page 19 
necessary, and is a proximate result of the six work-related incidents she suffered on April 15, 2005, September 19, 2006, November 10, 2006, September 16, 2007, March 5, 2008, and October 31, 2008.
64. The medical evidence does not show the relative contributions to plaintiff's injuries and disability resulting from the multiple on-the-job incidents. Therefore, apportionment is not possible.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. On April 15, 2005, plaintiff sustained an injury by accident and/or specific traumatic incident to her back arising out of and in the course of her employment with defendant-employer(first accident). N.C. Gen. Stat. § 97-2(6).
2. On September 19, 2006, plaintiff sustained an injury by accident and/or specific traumatic incident to her back arising out of and in the course of her employment with defendant-employer(second accident). N.C. Gen. Stat. § 97-2(6).
3. On November 10, 2006, plaintiff sustained an injury by accident and/or specific traumatic incident to her back arising out of and in the course of her employment with defendant-employer(third accident). N.C. Gen. Stat. § 97-2(6).
4. On September 16, 2007, plaintiff sustained an injury by accident and/or specific traumatic incident to her back arising out of and in the course of her employment with defendant-employer(fourth accident). N.C. Gen. Stat. § 97-2(6).
5. On March 5, 2008, plaintiff sustained an injury by accident and/or specific *Page 20 
traumatic incident to her back arising out of and in the course of her employment with defendant-employer (fifth accident). N.C. Gen. Stat. § 97-2(6).
6. On October 31, 2008, plaintiff sustained an injury by accident and/or specific traumatic incident to her back arising out of and in the course of her employment with defendant-employer(sixth accident). N.C. Gen. Stat. § 97-2(6).
7. As the result of the injuries by accident, plaintiff has been unable to earn wages in any employment and was totally disabled for these dates for which she is entitled to compensation: March 17, 2008 to May 4, 2008; from August 27, 2008 to September 23, 2008, and from February 11, 2009 to the present and continuing. N.C. Gen. Stat. § 97-29. Plaintiff has been paid by Sedgwick CMS all benefits owed for temporary total disability prior to the March 5, 2008 injury by accident.
8. Equity dictates that both defendant-carriers are equally liable for the payment of plaintiff's ongoing temporary total disability benefits. However, Sedgwick CMS would be prejudiced by paying half of plaintiff's compensation at the higher rate attributable to plaintiff's employment in 2008. Newcomb v. Greensboro PipeCo., 196 N.C. App. 675, 677 S.E.2d 167 (2009); Royce v.Rushco, 139 N.C. App. 322, 533 S.E.2d 284 (2000); Errante v.Cumberland County Solid Waste Management,106 N.C. App. 114, 415 S.E.2d 583 (1992).
9. Plaintiff's compensation rate while Sedgwick CMS was the carrier on the risk was $425.12 per week. At the time of the March 5, 2008 injury by accident, pursuant to the agreement of the parties, plaintiff's average weekly wage was $849.49, which yields a compensation rate of $566.35. For the periods of disability between March 5, 2008 and September 23, 2008, plaintiff is entitled to payment of disability compensation by Sedgwick CMS at a weekly rate of $212.56 (half of $425.12) and payment by Key Risk at the remaining *Page 21 
weekly rate of $353.79, so that plaintiff receives the full weekly compensation rate of $566.35 applicable as of the March 5, 2008 injury by accident. N.C. Gen. Stat. §§ 97-2(5); 97-29.
10. At the time of the October 31, 2008 injury by accident, pursuant to the agreement of the parties, plaintiff's average weekly wage was $785.68, which yields a compensation rate of $523.81. For the period from February 11, 2009 and continuing until further Order of the Commission, plaintiff is entitled to payment of disability compensation by Sedgwick CMS at a weekly rate of $212.56 (half of $425.12) and payment by Key Risk at the remaining weekly rate of $311.56, so that plaintiff receives the full compensation rate of $523.81 applicable as of the October 31, 2008 injury by accident. N.C. Gen. Stat. §§ 97-2(5); 97-29.
11. The medical testimony does not provide sufficient means to apportion that part of plaintiff's disability which was caused by any one of her prior accidents, and any attempt at apportionment would be speculative. Therefore, defendants are jointly and severally responsible for all medical treatment, including the surgery performed by Dr. Voos, incurred by plaintiff since March 5, 2008 or to be incurred by plaintiff in the future as a result of her compensable back injuries. N.C. Gen. Stat. § 97-25; Newcomb v. Greensboro Pipe Co.,supra; Royce v. Rushco, supra.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to an attorney's fee approved below, for the periods of disability between March 5, 2008 and September 23, 2008, defendant Sedgwick CMS shall pay compensation to plaintiff at a weekly rate of $212.56 and defendant Key Risk shall pay compensation to plaintiff *Page 22 
at the remaining weekly rate of $353.79, so that plaintiff receives the full compensation rate of $566.35 applicable as of the March 5, 2008 injury by accident. This amount has accrued and shall be paid in a lump sum.
2. Subject to an attorney's fee approved below, for the period from February 11, 2009 and continuing until further Order of the Commission, defendant Sedgwick CMS shall pay compensation to plaintiff at a weekly rate of $212.56 and Key Risk shall pay compensation to plaintiff at the remaining weekly rate of $311.56, so that plaintiff receives the full compensation rate of $523.81 applicable as of the October 31, 2008 injury by accident. Any accrued amount shall be paid in a lump sum.
3. Defendants Sedgwick CMS and Key Risk are jointly and severally responsible for all medical treatment, including the surgery performed by Dr. Voos, incurred by plaintiff since March 5, 2008 or to be incurred by plaintiff in the future as a result of her compensable back injuries.
4. A reasonable attorney's fee of 25% of the compensation due plaintiff shall be paid to her attorney as follows. Twenty-five percent of any lump sum due shall be paid directly to plaintiff's counsel and 25% of ongoing benefits shall be paid to counsel.
5. Defendants Sedgwick CMS and Key Risk shall pay the costs, to be billed equally between defendant-carriers.
 ORDER
IT IS HEREBY ORDERED, pursuant to N.C. Gen. Stat. § 97-86.1(b), that defendant-carriers Key Risk and Sedgwick CMS shall pay plaintiff temporary total disability benefits and medical compensation herein awarded regardless of any appeal taken from this Opinion and Award. If defendant-employer and either defendant-carrier are ultimately held not liable for the *Page 23 
amount they have paid under the provisions of this Opinion and Award, they shall be reimbursed by the carrier ultimately held liable.
This 19th day of October, 2010.
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ PAMELA T. YOUNG CHAIR
 S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 1